IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PARENTS FOR PRIVACY; KRIS GOLLY
and JON GOLLY, individually and as
guardians ad litem for A.G.; LINDSAY
GOLLY; NICOLE LILLIE; MELISSA
GREGORY, individually and as guardian ad
litem for T.F.; and PARENTS' RIGHTS IN
EDUCATION, an Oregon nonprofit corporation,

        Plaintiffs,

    v.

DALLAS SCHOOL DISTRICT NO. 2;
OREGON DEPARTMENT OF
EDUCATION; GOVERNOR KATE
BROWN, in her official capacity as the
Superintendent of Public Instruction; and
UNITED STATES DEPARTMENT OF
EDUCATION; BETSY DEVOS, in her official
capacity as United States Secretary of Education,
as successor to JOHN B. KING, JR.; UNITED

No. 3:17-cv-01813-HZ

OPINION & ORDER

STATES DEPARTMENT OF JUSTICE;
JEFF SESSIONS, in his official capacity as
United States Attorney General, as successor to
LORETTA F. LYNCH,

   Defendants.


Herbert G. Grey
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005

Ryan J. Adams
Caleb S. Leonard
181 N. Grant Street, Suite 212
Canby, OR 97013

   Attorneys for Plaintiffs

Peter R. Mersereau
Beth F. Plass
Mersereau Shannon LLP
111 SW Columbia Street, Suite 1100
Portland, OR 97201

   Attorneys for Defendant
   Dallas School District No. 2

Chad A. Readler
Billy J. Williams
Carlotta P. Wells
James O. Bickford
United States Department of Justice
20 Massachusetts Ave., NW
Washington, DC 20530

   Attorneys for Defendants
   United States Department
   of Education, Betsy Devos,
   United States Department of
   Justice, and Jeff Sessions

Darin M. Sands
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, OR 97204

Mathew W. dos Santos
Kelly Simon
ACLU Foundation of Oregon
P.O. Box 40585
Portland, OR 97240

Gabriel Z. Arkles
Shayna A. Medley-Warsoff
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004

      Attorneys for Defendant-
      Intervenor Basic Rights
      Oregon

Ellen F. Rosenblum
Sarah Weston
Patricia Rincon
Carla A. Scott
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

      Attorneys for Amici Governor Kate
      Brown and Oregon Department
      of Education

HERNÁNDEZ, District Judge:

The Court must determine whether Oregon public schools may allow transgender students to use restrooms, locker rooms, and showers that match their gender identity rather than their biological sex assigned at birth. Dallas High School, located in Dallas, Oregon, and under the control of Defendant Dallas School District No. 2 ("District"), adopted and implemented the Student Safety Plan ("Plan") together with underlying policies allowing transgender students to use restrooms, locker rooms, and showers that match their gender identity. Plaintiff Parents for Privacy is composed of current and former Dallas High School students ("Student Plaintiffs")

and their parents ("Parent Plaintiffs"). Plaintiff Lindsay Golly formerly attended Dallas High School during the 2015–2016 school year while the Plan was in place. Compl. ¶ 16, ECF 1. Plaintiffs Kris Golly and Jon Golly are her parents as well as the parents of their son A.G., an eighth-grade student who will soon attend Dallas High School. Compl. ¶ 16. Plaintiff Melissa Gregory is a parent of T.F., a student at Dallas high school. *Id.* at ¶ 17.[1]

Plaintiffs challenge the legality of the plan, seek to enjoin District from enforcing it, and request that the Court order District to require students to only use the restrooms, locker rooms, and showers that match their biological sex. Additionally, Plaintiffs seek to enjoin the U.S. Department of Education ("USDOE"), U.S. Department of Justice ("USDOJ"), and their respective secretaries (collectively "Federal Defendants") from taking any action based on USDOE's alleged rule redefining the word "sex" as used in Title IX to include gender identity. District and Federal Defendants have separately filed motions to dismiss Plaintiffs' claims.

Moreover, Basic Rights Oregon ("BRO"), a non-profit organization dedicated to protecting the rights of Oregon's LGBTQ community, filed a motion to intervene as a defendant in this case. *See* Mot. to Intervene, ECF. 24. The Court granted BRO's motion to intervene and BRO filed its own motion to dismiss. *See* BRO's Mot. to Dismiss, ECF 30.

Lastly, the Oregon Department of Education ("ORDOE") and Governor Kate Brown (collectively "State") were originally named parties in this lawsuit. Upon the parties' stipulation, Plaintiffs' claims against those defendants were dismissed. *See* Stip. Notice of Dismissal, ECF 11. State, however, moved to rejoin this litigation as amicus curiae. *See* Mot. for Leave to Appear as Amicus Curiae, ECF 50. The Court granted that motion, and State filed its amicus brief in support of District's Motion to Dismiss. *See* Amicus Br., ECF 50-1. In sum, there are

---

[1] Plaintiffs also include Parents' Rights in Education, a nonprofit organization based out of Washington County, Oregon. Compl. ¶ 9. This Plaintiff, however, is merely a named party and is not specifically mentioned in any factual allegations of the Complaint nor in any briefing.

three fully-briefed motions to dismiss before the Court.[2] For the reasons discussed below, the

motions are GRANTED and this case is DISMISSED.

Plaintiffs bring the following eight claims for relief:

**First Claim:** (against Federal Defendants) Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.* Compl. ¶¶ 136–185.

**Second Claim:** (against District and Federal Defendants) Violation of the Fundamental Right to Privacy. *Id.* at ¶¶ 186–206.

**Third Claim:** (against District and Federal Defendants) Violation of the Parents' Fundamental Right to Direct the Education and Upbringing of Their Children. *Id.* at ¶¶ 207–220.

**Fourth Claim:** (against District) Violation of Title IX, 20 U.S.C. § 1681 *et seq. Id.* at ¶¶ 221–247.

**Fifth Claim:** (against Federal Defendants): Violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq. Id.* at ¶¶ 248–255.

**Sixth Claim:** (against District and Federal Defendants): Violation of the First Amendment's Guarantee of Free Exercise of Religion. *Id.* at ¶¶ 256–264.

**Seventh Claim:** (against District) Public Accommodation Discrimination, Or. Rev. Stat. ("O.R.S.") §§ 659A.400, 659A.885. *Id.* at ¶¶ 265–271.

**Eighth Claim:** (against District) Discrimination in Education, O.R.S. 659.850. *Id.* at ¶¶ 272–277.

Plaintiffs and District conferred and consent to the dismissal of some of Plaintiffs'

claims. First, they agree that Plaintiff Lindsay Golly should be dismissed because she does not

have standing. Second, the parties agree that Plaintiff Nicole Lillie should be dismissed; while

her name is in the case caption, she is not included in any of the Complaint's allegations. Third,

Plaintiffs consent to the dismissal of their request for compensatory damages as to Plaintiffs A.G.

---

[2] A motion for a preliminary injunction is also embedded in the Complaint's prayer for relief. *See* Compl. pp. 63–64. In substantially similar cases, courts have adjudicated motions for preliminary injunctions before entertaining Rule 12 motions to dismiss. Here, however, Plaintiffs have not pressed the issue, and the parties do not discuss an injunction anywhere in their briefing. At oral argument, the parties indicated their intent to litigate the motions to dismiss currently before the Court, since resolution of the motions may moot any potential injunction.

and T.F. Furthermore, Plaintiffs concede that their third claim for relief—violation of the right to direct the education and upbringing of one's children—should be dismissed to the extent that it is based on the District's alleged liability for the LaCreole Middle School special needs assessment. *See* Pl.'s Resp. to District's Mot. to Dismiss 2, ECF 41.

## BACKGROUND[3]

### I.      Definitions

As a preliminary matter, the Court finds it necessary to explain its use of several relevant terms. In a recent decision, the Third Circuit aptly summarized the same set of terms the Court uses throughout this Opinion & Order. *See Doe v. Boyertown Area Sch. Dist.*, No. 17-3113, 2018 WL 3016864, at *1 (3d Cir. June 18, 2018). The Court adopts the following definitions from the Third Circuit:

> "Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female." Typically, sex is determined at birth based on the appearance of external genitalia.
>
> "Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context." A person's gender identity is their subjective, deep-core sense of self as being a particular gender. . . . "[C]isgender" refers to a person who identifies with the sex that person was determined to have at birth. The term "transgender" refers to a person whose gender identity does not align with the sex that person was determined to have at birth. A transgender boy is therefore a person who has a lasting, persistent male gender identity, though that person's sex was determined to be female at birth. A transgender girl is a person who has a lasting, persistent female gender identity though that person's sex was determined to be male at birth.

---

[3] The facts recited below are taken from Plaintiffs' complaint and exhibits attached thereto. The Court assumes that the Complaint's factual allegations are true unless they are contradicted by the Complaint's exhibits. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint, and we do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations.") (internal quotation marks, citations, and alterations omitted).

*Id.* (citations omitted).

## II.     Dallas School District and the Student Safety Plan

Dallas High School is located in Dallas, Oregon in Polk County. Compl. ¶ 19. Student A was a twelfth grade student at Dallas High School. *Id.* at ¶ 76. Student A was born and remains biologically female. *Id.* at ¶ 77. Before September 2015, Student A used the girls' restrooms, locker rooms, and showers (collectively "facilities"). *Id.* at ¶ 77. In September 2015, Student A publicly identified as a boy and asked District to allow him[4] to use the boys' facilities. *Id.* at ¶ 78–79.

In November 2015, District responded to Student A's request by implementing the Student Safety Plan entitled "Transgender Student Access to Locker Room." Compl. Ex. A, at 1. The Plan permits Student A to use Dallas High School's locker rooms, restrooms, and showers consistent with his gender identity. Compl. ¶ 75, Ex. A, at 1. The preamble to the Plan states:

> All students have rights for attendance at public schools, and we have to follow the laws which protect those students['] rights. This safety plan has been created to support a transgender male expressing the right to access the boy's locker room at Dallas High School. Following are targeted areas of concern and the procedures or actions aimed to support all students in this transition.

Compl. Ex. A, at 1. At that time, Student A had not expressed which bathroom he felt comfortable using. *Id.* at ¶ 79. Accordingly, the Plan states that Student A "can use any of the bathrooms in the building to which he identifies sexually." Compl. Ex. A, at 2.

Furthermore, the Plan, as referred to by the parties, also encompasses several previously established District policies. Compl. Exs. B–G. District's nondiscrimination policy provides that District "prohibits discrimination and harassment on any basis protected by law, including . . . an

---

[4] Following Ninth Circuit decisions involving transgender people, the Court uses the masculine rather than feminine pronouns when referring to Student A. *See Schwenk v. Hartford*, 204 F.3d 1187, 1192 n.1 (9th Cir. 2000). In other words, when referring to a transgender person, the Court uses the pronoun consistent with that person's gender identity.

individual[']s perceived or actual . . . sex" or "sexual orientation." Compl. Ex. B, at 1. Sexual

orientation under the policy "means an individual's actual or perceived . . . gender identity,

regardless of whether the individual's gender identity, appearance, expression or behavior differs

from that traditionally associated with the individual's sex at birth." *Id.* Likewise, District has a

policy entitled "Equal Education Opportunity" providing that "[e]very student of the district will

be given equal educational opportunities regardless of . . . sex" or "sexual orientation." Compl.

Ex. C. The policy explains:

> Further, no student will be excluded from participating in, denied
> the benefits of, or subjected to discrimination under any
> educational program or activity conducted by the district. The
> district will treat its students without discrimination on the basis of
> sex as this pertains to course offerings, athletics, counseling,
> employment assistance and extracurricular activities.

*Id.*

In accordance with the Plan, Student A used the boys' locker rooms, showers, and

restrooms at Dallas High school. Compl. ¶ 79. Other male students, including Student Plaintiffs,

have used school facilities at the same time as Student A. *Id.* at ¶ 79. Specifically, Student A has

used the boys' locker room and showers and has changed clothes while male students were

present. *Id.* at ¶ 82. Plaintiffs allege that male students at Dallas High school experience

"embarrassment, humiliation, anxiety, intimidation, fear, apprehension, and stress produced by

using the restroom with students of the opposite sex[.]"*Id.* at ¶ 83. The alleged risks posed to

those students persist despite the presence of privacy stalls in the bathrooms because "there are

large gaps above and below the stall doors, and gaps along the sides of the doors" through which

"another student could see through even inadvertently." *Id.* Therefore, Plaintiffs maintain that

Student Plaintiffs "must risk exposing themselves to the opposite sex every time they use the

restroom." *Id.* at ¶ 83. Consequently, Student Plaintiffs and other students use the restroom as

little as possible and "risk tardiness by hurrying to distant facilities of the school, during short 5-minute passing periods, to try and find a restroom not likely to be used by a student of the opposite biological sex." *Id.* at ¶ 85.

Student and Parent Plaintiffs expressed their concerns about the Plan to Dallas High School's principal who informed them that all facilities may be used by any student regardless of biological sex. *Id.* at ¶ 87. The principal also told Parent Plaintiffs that their students could use the unisex staff lounge which has no shower. *Id.* at ¶ 91. Dallas School Board meetings were held on December 14, 2015, January 19, 2016, and February 11, 2016. *Id.* at ¶ 93. At those meetings, District supported the Plan over Plaintiffs' objections and those of other parents and students. *Id.*[5]

## II.    Federal Defendants' Administrative Actions

Plaintiffs allege that Federal Defendants have exercised their authority to promulgate, administer, and enforce a new legislative rule redefining "sex" within the meaning of Title IX to include gender identity and prohibiting school districts from providing sex-specific facilities. *Id.* at ¶¶ 26–30, 32–39, 49–73. Federal Defendants' new legislative rule ("Rule") as alleged in the Complaint is composed of a series of Federal Guidelines promulgated between April 2014 and May 2016, including:

-    USDOE, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 2014). Compl. Ex. H [hereinafter "Q&A on Sexual Violence"].

---

[5] Plaintiffs also challenge another action taken by District related to La Creole Middle School. Compl. ¶ 96. In February 2017, District administered a "Needs Assessment" to La Creole Middle School students without prior notice, knowledge, or consent of the students' parents. Compl. Ex. P. The Needs Assessment asked students to disclose information about problems or issues they were experiencing involving clothing, school supplies, family food sufficiency, alcohol or drug abuse, suicide, self-image, sexual orientation and gender identity, unhealthy relationships and other subjects of a personal or family nature. Compl. ¶ 96. As noted above, Plaintiffs conceded this claim.

- USDOE, Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities*, (Dec. 2014). Compl. Ex. I [hereinafter "Q&A on Single-Sex Activities"].

- USDOE, Office of Civil Rights, *Title IX Resource Guide*. (Apr. 2015). Compl. Ex. J.

- USDOJ, Civil Rights Division, USDOE, Office for Civil Rights, *Dear Colleague Letter on Transgender Students* (May 13, 2016). Compl. Ex. K [hereinafter "May 2016 Dear Colleague Letter"].

First, in April 2014, USDOE published the Q&A on Sexual Violence which provides: "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity[.]" Compl. Ex. H at 12. That guidance was withdrawn in September 2017, before this lawsuit was filed. *See* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

Second, in December 2014, USDOE published the Q&A on Single-Sex Classes, providing that:

> All students, including transgender students and students who do not conform to sex stereotypes are protected from sex-based discrimination under Title IX. Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of planning, implementation, enrollment, operation, and evaluation of single-sex classes.

Compl. Ex. I, at 30.

Third, in April 2015, USDOE published the Title IX Resource Guide which reiterates that Title IX's prohibition of sex discrimination includes gender identity. Compl. Ex. J, at 5. Specifically, the prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity. *Id.* at 5–6. "Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a recipient's obligations." *Id.* at 21.

The fourth challenged document is the May 2016 Dear Colleague Letter jointly issued by the USDOJ and USDOE. Compl. Ex. K. The May 2016 Dear Colleague Letter repeated that Title IX's sex-discrimination prohibition "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status." *Id.* at 2. Federal Defendants characterized this letter as "significant guidance" that "does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations." *Id.* at 2. Most importantly, this document provides specific guidance on transgender students' access to sex-segregated activities and facilities:

### 3.    *Sex-Segregated Activities and Facilities*

Title IX's implementing regulations permit a school to provide sex-segregated restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes under certain circumstances. When a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity.

**Restrooms and Locker Rooms.** A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity. A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy.

**Athletics.** Title IX regulations permit a school to operate or sponsor sex-segregated athletics teams when selection for such teams is based upon competitive skill or when the activity involved is a contact sport. A school may not, however, adopt or adhere to requirements that rely on overly broad generalizations or stereotypes about the differences between transgender students and other students

of the same sex (i.e., the same gender identity) or others' discomfort with transgender students. Title IX does not prohibit age-appropriate, tailored requirements based on sound, current, and research-based medical knowledge about the impact of the students' participation on the competitive fairness or physical safety of the sport.

*Id.* at 4.

On February 22, 2017, the USDOJ and USDOE published a second dear colleague letter withdrawing the guidance provided in their May 2016 Dear Colleague Letter. *See* U.S. Dep'ts of Educ. & Justice, Dear Colleague Letter (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf [hereinafter "February 2017 Dear Colleague Letter"]. The February 2017 Dear Colleague Letter began: "The purpose of this guidance is to inform you that the Department of Justice and the Department of Education are withdrawing the statements of policy and guidance reflected" in the May 2016 Dear Colleague Letter. *Id.* The letter explained that prior guidance's interpretation of "on the basis of sex" in Title IX to include gender identity has "given rise to significant litigation regarding school restrooms and locker rooms." *Id.*

The February 2017 Dear Colleague Letter did not state that the prior guidance was unlawful, nor did Federal Defendants replace the prior guidance with new guidance. Rather, the letter stated that, in light of litigation on the issue producing differing results, "there must be due regard for the primary role of the States and local school districts in establishing education policy." *Id.* "In these circumstances, the [USDOE and USDOJ] have decided to withdraw and rescind the above-reference guidance documents in order to further and more completely consider the legal issues involved. The Departments thus will not rely on the views expressed within them." *Id.*; *see also* Compl. Ex. N (USDOE instructions to field offices stating that in light of the February 2017 Dear Colleague Letter and other litigation developments, the USDOE

should not rely on the May 2016 Dear Colleague letter when analyzing Title IX discrimination claims).

## STANDARDS

On a motion to dismiss, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint is construed in favor of the plaintiff, and its factual allegations are taken as true. *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "[F]or a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The court, however, need "not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Id.* at 555.

## DISCUSSION

As outlined above, Plaintiffs allege eight claims for relief which the Court has grouped together as follows: (I) APA; (II) the right to privacy; (III) Title IX; (IV) Oregon state law; (V) parents' rights to direct the education and upbringing of their children; and (VI) First Amendment and RFRA. The Court will discuss each topic in turn.

## I.     APA

Plaintiffs' first claim for relief alleges that Federal Defendants violated by the APA through promulgating and enforcing "a new legislative rule that redefines the term 'sex' in Title IX and its accompanying regulations to mean, or at least include, 'gender identity.'" Compl. ¶ 137. They argue that the May 2016 Dear Colleague Letter demonstrates that Federal Defendants will investigate and enforce Title IX against school districts that do not permit transgender students to use restrooms, locker rooms and showers consistent with their gender identity. *Id.* at ¶¶ 140–41. Plaintiffs contend that Federal Defendants' administrative actions are in excess of legal authority, arbitrary and capricious, contrary to the U.S. Constitution, and done without observance of required administrative procedures. *Id.* at ¶ 145 (citing 5 U.S.C. § 706(2)(A)–(D)).

In response, Federal Defendants move to dismiss Plaintiffs' APA claim on the ground that Plaintiffs lack standing. Two of the four guidance documents that comprise the challenged Rule were withdrawn before this lawsuit commenced. Federal Defendants claim that Plaintiffs cannot show that they suffered any injury as a result of the Rule or that Plaintiffs' alleged injuries would be redressed by the relief that they seek from Federal Defendants. The May 2016 Dear Colleague Letter—the only guidance specifically addressing transgender students' use of school facilities—was expressly withdrawn by the February 2017 Dear Colleague Letter. Federal Defendants point to District's Plan as the sole source of Plaintiffs' alleged injuries. In other words, withdrawal of Federal Defendants' Rule would neither compel District to rescind its Plan nor require students at Dallas High School to use facilities matching their biological sex.

To have Article III standing, a plaintiff must show that, (1) it suffered an "injury in fact," (2) arising out of the defendant's conduct, and (3) "it must be 'likely,' as opposed to

'speculative,' that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

## A.    *Injury*

Plaintiffs allege that they have "suffered a legal wrong as a direct result of USDOE's actions, because Plaintiffs' constitutional and statutory rights were and continue to be violated by the Student Safety Plan, which is the direct result of USDOE's enforcement of its new rule." Compl. ¶ 144. Federal Defendants do not challenge the injury requirement for standing. Instead, they argue that the alleged injury is solely attributable to District's Plan and that Plaintiffs are unable to establish either causation or redressability. As discussed below, however, the Court finds that Plaintiffs have not plausibly alleged their remaining claims based on District's Plan. Accordingly, because those dismissed claims form the basis for Plaintiff's alleged injury, Plaintiffs' APA claim falls with them. The Court will nevertheless determine whether Plaintiffs have satisfied the remaining elements of standing.

## B.    *Causation*

Assuming that Plaintiffs have plausibly alleged an injury-in-fact, Federal Defendants argue that Plaintiffs' injuries are not fairly traceable to the challenged administrative actions. Federal Defendants point out that four of the five claims that Plaintiffs allege against them do not mention any federal action. *See* Fed. Defs.' Mot. to Dismiss 8, ECF 49. Plaintiffs' second, third, fifth, and sixth claims for relief only allege actions taken by District. Plaintiffs' sole causal connection lies in Federal Defendants' alleged influence on District's decision to enact and enforce the Plan. Particularly, Plaintiffs allege that Federal Defendants' enforcement of Title IX against other school districts based on the Rule caused District to enact the Plan.

Causation requires showing that an injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). An indirect injury, however, "does not in itself preclude standing." *Warth v. Seldin*, 422 U.S. 490, 504 (1975). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (citing *Bennett*, 520 U.S. at 167). "[W]hat matters in not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain[.]'" *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (quoting *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984)).

District's Plan was enacted in November 2015. At that time, of the four challenged guidance documents comprising the Rule, the Q&A on Sexual Violence, the Q&A on Single-Sex Activities, and the Title IX Resource Guide were in effect. All three of those documents state that USDOE interprets Title IX as prohibiting discrimination on the basis of gender identity. None of those documents, however, state that Title IX requires school districts to permit transgender students to use school facilities consistent with their gender-identity. Only the May 2016 Dear Colleague Letter—issued six months after the Plan was made effective—requires school districts to take such action. Compl. Ex. K, at 4. Plaintiffs allege that Federal Defendants "have enforced the Rule through public investigations, findings, and threats to revoke millions of dollars in federal funding from several school districts because they provided sex-specific private facilities." Compl. ¶ 63. In particular, Plaintiffs point to USDOE's actions against Township High School District 211 ("District 211") in Palatine, Illinois. *Id.* at ¶ 64. There, in November 2015, USDOE issued a letter stating that District 211 violated Title IX by not allowing a

transgender female to use the girls' locker room. *Id.* at ¶¶ 65–66. District 211 and USDOE

entered into an agreement allowing transgender student access to the disputed facilities. Compl.

¶ 67, Ex. M. Likewise, the USDOJ filed a lawsuit in May 2016 against North Carolina based on

the University of North Carolina's enforcement of sex-specific private facilities. Compl. ¶¶ 69–

71.

In response to Federal Defendants' actions, students, parents, and interest groups similar

to Plaintiffs in this case, joined together and filed federal lawsuits asserting substantially similar

claims. *See* Fed. Defs.' Mot. to Dismiss 4–5 (collecting cases). Students and parents involved in

the District 211 case filed their own lawsuit alleging claims substantially identical to those

asserted in this case. That particular case will be discussed in greater detail below.

In turn, Federal Defendants issued the February 2017 Dear Colleague Letter. The purpose

of the letter was, in part, to inform the public that Federal Defendants were "withdrawing the

statements of policy and guidance reflected in" the May 2016 Dear Colleague Letter. U.S. Dep'ts

of Educ. & Justice, Dear Colleague Letter (Feb. 22, 2017). The February 2017 Dear Colleague

Letter states that its interpretation that "on the basis of sex" in Title IX "requires access to sex-

segregated facilities based on gender identity" has "given rise to significant litigation regarding

school restrooms and locker rooms." *Id.* The letter continues by acknowledging then-existing

conflicting judicial rulings on the issue among federal courts. Based on those circumstances, the

letter states that Federal Defendants "have decided to withdraw and rescind the above-referenced

guidance documents in order to further and more completely consider the legal issues involved.

The Departments thus will not rely on the views expressed within them." *Id.* Furthermore,

Plaintiffs attach to their complaint another letter from USDOE to its field offices dated June 6,

2017. Compl. Ex. N. Similar to the February 2017 Dear Colleague Letter, this letter informs

regional directors of USDOE's Office for Civil Rights that they "may not rely on the policy set forth in the May 2016 Dear Colleague Letter." *Id.* at 1.

In response to the February 2017 Dear Colleague Letter, several lawsuits challenging Federal Defendants' Rule were voluntarily dismissed. *See* Fed. Defs.' Mot. to Dismiss 5 (collecting cases). In addition, the Supreme Court previously granted certiorari on the question of whether courts should defer to the May 2016 Dear Colleague Letter. *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, ___ U.S. ___, 137 S. Ct. 369 (2016) (mem.). Again, upon issuance of the February 2017 Dear Colleague Letter, the Supreme Court vacated the Fourth Circuit's decision in that case and remanded for a determination of whether the issue had been mooted. *Grimm*, ___ U.S. ___, 137 S. Ct. 1239 (2017) (mem.). Upon remand, the district court determined that the transgender student plaintiff's Title IX claim was not mooted and was sufficiently pled regardless of Federal Defendants' administrative actions. *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 748 (E.D. Va. 2018).

Based on the Complaint and its attached exhibits, Plaintiffs have not plausibly alleged a causal link between Federal Defendants' challenged Rule and the alleged injury. Despite having full knowledge of the events described above, Plaintiffs nevertheless filed this lawsuit on November 13, 2017, including allegations against Federal Defendants based on their rescinded interpretation of Title IX. District's Plan was enacted in November 2015, well before the May 2016 Dear Colleague letter was issued. Similarly, most of Federal Defendants' enforcement actions alleged in the complaint occurred after the Plan was enacted. Other than USDOE's letter of a Title IX violation to District 211, the remaining enforcement allegations pertain to actions taken after the Plan's enactment. Therefore those enforcement actions cannot support Plaintiff's alleged causal link.

As to the District 211 action, USDOE issued its violation letter on November 2, 2015, and it entered into an agreement with District 211 on December 2, 2015. Compl. Exs. L & M. While it is possible that USDOE's letter issued to District 211 influenced the District's decision to enact the Plan that same month, that conclusion is merely speculative and fails to plausibly establish causation. Plaintiffs "must offer facts showing that the government's unlawful conduct is at least a substantial factor motivating the third parties' actions" and they must "make that showing without relying on 'speculation' or 'guesswork' about the third parties' motivations." *Mendia*, 768 F.3d at 1013 (internal quotation marks and citations omitted).

The sequence of events in this case shows that District's Plan was enacted in response to Student A's accommodation request, not Federal Defendants' actions. Compl. ¶ 78–82. Upon first receiving Student A's request in September 2015, District initially provided an accommodation by allowing him to access single-use facilities. *Id.* at ¶¶ 78–79. District then formalized its response to Student A by issuing the Student Safety Plan in November 2015. Compl. ¶ 82. The Plan begins by stating that "[a]ll students have rights for attendance at public schools, and we have to follow the laws which protect those student rights." Compl. Ex. A, at 1. Nothing in the Plan states that District was motivated by external litigation or enforcement of Title IX as a basis for its action. Rather, District lists elsewhere that its nondiscrimination policies comply with several Oregon state laws as well as over a dozen federal laws, including Title IX. *See, e.g.*, Compl. Ex. B, at 2; Ex. D at 3. It would be purely speculative to conclude that Federal Defendants' enforcement actions—as opposed to Student A's request or the requirements of many other state and federal laws—substantially motivated District to enact its Plan. There are no allegations based on District's statements explaining why they enacted the Plan. Plaintiffs simply allege that Federal Defendants' enforcement actions caused District to

implement the Plan. However, in light of the documents attached to the complaint, the Court is no longer required to accept that allegation as true.

Accordingly, the Court concludes that Plaintiffs have not alleged that their purported injuries are fairly traceable to Federal Defendants' actions. Therefore, Plaintiffs have not sufficiently pleaded causation sufficient to establish Article III standing.

## C.     *Redressability*

Lastly, assuming Plaintiffs sufficiently alleged injury and causation, they must still establish standing's third requirement—redressability. Generally, a plaintiff must show that its requested relief will redress its alleged injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.

*Lujans*, 504 U.S at 562. The concept of redressability "has been ingrained in our jurisprudence from the beginning," the point of which is to determine "whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co.*, 523 U.S. at 103 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). The Supreme Court has found that there is no standing for lack of redressability where "the injury to the plaintiff by the defendant was *indirect* (e.g., dependent on the action of a third party)." *Id.* at 125.

In this case, Plaintiffs seek relief including a Court order declaring the challenged guidance documents unlawful and directing Federal Defendants to remove those documents from their public websites. Compl. ¶ 147, p. 63. Plaintiffs also seek to enjoin Federal Defendants from "enforcing Title IX in a manner that requires District to give any students the right of entry to,

and use of, the private facilities (including locker rooms, showers and restrooms) designated for students of the opposite sex." *Id.* at ¶ 147, p. 63.

Plaintiffs have not established that obtaining the relief they seek against Federal Defendants will redress their alleged injury. A favorable ruling for Plaintiff would result in the rescission of the Rule and would enjoin Federal Defendants from taking enforcement actions against District described above. This relief would not, however, redress Plaintiffs' alleged injury. District adopted its plan independent of any action by Federal Defendants and an order invalidating the Rule would not result in the Plan's withdrawal. In other words, District's plan would continue and Plaintiffs' injury would persist notwithstanding granting Plaintiffs' relief against Federal Defendants. Plaintiffs' alleged legal wrongs based on their other claims would remain unaffected by a Court order invalidating the Rule and enjoining Federal Defendants.

Furthermore, as discussed above, District cites to over two dozen state and federal laws as bases for its non-discrimination policy underlying the Student Safety Plan. *See* Compl. Ex. B. Invalidation of Rule as to Title IX would not affect District's obligations under other state and federal laws. In any event, Federal Defendants have unequivocally withdrawn the only guidance on the issue of transgender student access to school facilities and they have forbidden reliance on that guidance. *See* Feb. 2017 Dear Colleague Letter. The February 2017 Dear Colleague Letter states that Federal Defendants believe "there must be due regard for the primary role of the States and local school districts in establishing educational policy." *Id.* In sum, District retains the discretion to continue enforcing the Plan even if the Court granted Plaintiffs the relief they sought against Federal Defendants. Therefore, Plaintiffs have not demonstrated that their requested relief as to Federal Defendants will redress their alleged injury.

//

## II.    The Right to Privacy

Next, Plaintiffs allege that District and Federal Defendants violated Parent and Student Plaintiffs' right to privacy guaranteed by the U.S. Constitution. While there is no generalized right to privacy, the Supreme Court has recognized a privacy right against certain kinds of governmental intrusions under the Due Process Clause of the Fourteenth Amendment. *Katz v. United States*, 389 U.S. 347, 350 (1967); *Roe v. Wade*, 410 U.S. 113, 152 (1973). "[O]nly personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' are included in this guarantee of personal privacy." *Roe*, 410 U.S. at 152 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). The Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrifices." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks and citations omitted). The law further requires "a 'careful description' of the asserted fundamental liberty interest." *Id.* Courts are, however, "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

### A.    *Fundamental Right*

Plaintiffs formulate their privacy right as "a fundamental right to bodily privacy" which includes "a right to privacy of one's fully or partially unclothed body and the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex." Compl. ¶188. Reformulated elsewhere in the Complaint, Plaintiffs argue:

> The ability to be clothed in the presence of the opposite biological sex, along with the freedom to use the restroom, locker room and

shower away from the presence of the opposite biological sex, is fundamental to most people's sense of self-respect and personal dignity, including plaintiffs', who should be free from State-compelled risk of exposure of their bodies, or their intimate activities.

*Id.* at ¶ 199.

District and BRO argue that Plaintiffs' asserted fundamental right is overbroad and unrecognized by any federal court. Under substantially similar circumstances, a district court considered a nearly identically-phrased fundamental right. *See Students v. U.S. Dep't of Educ.*, No. 16-CV-4945, 2016 WL 6134121, at *22 (N.D. Ill. Oct. 18, 2016) [hereinafter "*Students & Parents R&R*"], *report and recommendation adopted*, *U.S. Dep't of Educ.*, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) [hereinafter "*Students & Parents*"]. That court also considered a second restatement of the right at issue: "does letting a biological male use the girls' locker room and restrooms, and so subjecting Girl Plaintiffs to the risk of compelled exposure of their bodies to the opposite biological sex, violate Girl Plaintiffs' constitutional right to privacy?" *Students & Parents R&R*, 2016 WL 6134121, at *23. The district court found the latter formation more apt than the one from the complaint; it then posited its own version of the issue: "do high school students have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs?" *Id.* The Court adopts the district court's formation in *Students & Parents*, which is a more specific and complete statement of Plaintiffs' asserted privacy right in this case.

Equipped with this description of the asserted right, the Court must determine whether high school students have a fundamental right not to share restrooms or locker rooms with transgender students. Defendants direct the Court to several cases similar to this one in which courts have rejected Plaintiffs' purported privacy interest in favor of transgender students' access

to school facilities. The following decisions are not binding upon this Court; however, in the absence of binding authority from the Ninth Circuit, the Court relies on these opinions for their persuasiveness. Defendants primarily rely upon *Students & Parents*, 2017 WL 6629520. As discussed above, the court in *Students & Parents* concluded that high school students did not have a fundamental right not to share school facilities with transgender students whose assigned sex is different than theirs. *Students & Parents R&R*, 2016 WL 6134121, at *23. In reaching that conclusion, the court considered the practical implications of transgender students' access to facilities, our Nation's history of protecting and deferring to school administrators' discretion, and contemporary notions of liberty and justice. *Id.* at *24–27.

The court noted that no student was "compelled" by a state actor to use facilities with a transgender student. Rather, District 211's policy allowed transgender students to use facilities of their choice. The facilities included privacy stalls as well as other protections. Additionally, privacy alternatives such as separate, single-user facilities were available. Students could also request the use of an alternate changing area within the locker rooms. The court found these privacy protections significant and that they distinguished the case from those involving compulsion and involuntary invasions of privacy. The court opined:

> Generally speaking, the penumbral rights of privacy the Supreme Court has recognized in other contexts protect certain aspects of a person's private space and decision-making from governmental intrusion. Even in the context of the right to privacy in one's own body, the cases deal with compelled intrusion into or with respect to a person's intimate space or exposed body. No case recognizes a right to privacy that insulates a person from coming into contact with someone who is different than they are, or who they fear will act in a way that causes them to be embarrassed or uncomfortable, when there are alternative means for both individuals to protect themselves from such contact, embarrassment, or discomfort.

*Id.* at *24. Regarding the Nation's history of deferring to schools, the court wrote:

> Therefore, our Nation's deeply rooted history and tradition of protecting school administrators' discretion require that this Court not unduly constrain schools from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him or her for later professional training, and in helping him or her to adjust normally to his or her environment.

*Id.* (internal quotation marks, alterations, and citations omitted). The court also found that the plaintiffs' asserted privacy right was inconsistent with contemporary notions of liberty and justice. *Id.* at *25. It was persuaded that transgender people do not live their lives in conformance with their sex assigned at birth and the transgender students at issue in that case were treated by others in a manner that was consistent with their gender identities. Additionally, the court reflected on the fact that, at that time, the U.S. military and militaries of other nations allowed transgender personnel to serve fully and openly. Recognition and acceptance of transgender people in various areas of society contradicted plaintiffs' asserted right of high school students not to share facilities with transgender students.

Similarly, the Seventh Circuit granted a transgender boy's request for a preliminary injunction enjoining a school district from preventing him from using facilities consistent with his gender identity. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1038 (7th Cir. 2017), *cert. dismissed*, *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138 S. Ct. 1260 (2018). The plaintiff in that case, a transgender boy named Ash, was forced by the school district to use either the girls' restroom or a gender-neutral restroom in the school's main office. *Id.* at 1040. Ash had publicly transitioned and believed using the girls' restroom would undermine his transition. *Id.* He also feared that being the only student allowed to use the restroom in the main office would draw unwanted attention to his transition and have a stigmatizing effect. *Id.* Lastly, he was concerned about being disciplined for attempting to use the girls' restroom. *Id.* As a result, Ash drank less water and avoided using

restrooms during the school day even though it exacerbated his medical condition that made him more susceptible to fainting and seizures. *Id.* at 1041. Ash ultimately used the boys' restroom later in high school and was punished for violating school policy. *Id.* at 1042.

When analyzing Ash's assertion of irreparable harm, the Seventh Circuit found that Ash's use of the boys' restroom was integral to his transition and emotional well-being. *Id.* at 1045. The court also found that "he was faced with the unenviable choice between using a bathroom that would further stigmatize him and cause him to miss class time, or to avoid use of the bathroom altogether at the expense of his health." *Id.* When considering Ash's likelihood of success on the merits of his Equal Protection claim, the court found that the school's policy "does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how Ash, as a transgender boy, uses the bathroom: by entering a stall and closing the door." *Id.* at 1052.

The court in that case elaborated:

> A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing bodily functions. Or for that matter, any other student who uses the bathroom at the same time. Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall.

*Id.* Accordingly, the court found that Ash was likely to succeed on the merits of his Equal Protection claim. Lastly, the court found the balance of harms favored Ash and the school district had not demonstrated that it will suffer any harm "[n]or have they demonstrated that Ash's presence has actually caused an invasion of any other student's privacy." *Id.* at 1054.[6]

---

[6] The Supreme Court granted certiorari on the dispositive issue in *Whitaker*. The relevant question presented asked: "Whether a school policy requiring boys and girls to use separate bathroom facilities that correspond to their

In further example, a Western District of Pennsylvania court granted transgender high school students' motion for a preliminary injunction enjoining the school from requiring them to use only bathrooms matching their sex assigned at birth or single-user bathrooms. *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 272 (W.D. Pa. 2017). When analyzing the plaintiffs' Equal Protection claim, that court considered whether other students' right to privacy provided a constitutionally sufficient basis supporting the school district's policy. The court found that the physical layout of the school's facilities ensured adequate privacy. *Id.* at 290–91. The court was persuaded that the bathroom stalls "afforded actual physical privacy from others viewing their external sex organs and excretory functions. Conversely, others in the restrooms are shielded from such views." *Id.* at 291.

In another example, the Eastern District of Pennsylvania in *Doe v. Boyertown Area School District* rejected a high school student's challenge to a school rule allowing transgender students to use facilities consistent with students' gender identities. 276 F. Supp. 3d 324 (E.D. Pa. 2017), *aff'd*, 890 F.3d 1124 (3d Cir. 2018). The Third Circuit unanimously and emphatically affirmed the district court's decision from the bench.[7] The *Doe* court summarized the student plaintiffs' asserted right to bodily privacy as follows:

> At bottom, the plaintiffs are opposed to the mere presence of transgender students in locker rooms or bathrooms with them because they designate them as members of the opposite sex and note that, *inter alia*, society has historically separated bathrooms and locker rooms on the basis of biological sex to preserve the privacy of individuals from members of the opposite biological sex.

---

biological sex is sex stereotyping that constitutes discrimination 'based on sex' in violation of Title IX." *Whitaker*, 858 F.3d 1034, *petition for cert. filed*, 2017 WL 3713066, at *1 (U.S. Aug. 27, 2017) (No. 17-301). The parties, however, voluntarily dismissed the case, leaving this Court without further guidance.

[7] On June 18, 2018, the Third Circuit subsequently issued a formal written opinion stating: "Although we amplify the District Court's reasoning because of the interest in this issue, we affirm substantially for the reasons set forth in the District Court's opinion." *Doe*, 2018 WL 3016864, at *1.

*Id.* at 330. In that case, a transgender boy changed clothes with the student plaintiffs in the boys'

locker room and one plaintiff observed the transgender boy "wearing nothing but shorts and a

bra." *Id.* at 332. In response to that encounter and others like it, student boy plaintiffs felt

ashamed and embarrassed, changed quickly, and otherwise avoided encountering a transgender

student in school facilities. *Id.* When analyzing the plaintiffs' §1983 claim based on the

fundamental right to privacy, the court wrote that plaintiffs believe "[t]he Constitution prohibits

Defendants from placing students in situations where their bodies or private, intimate activities

may be exposed to the opposite sex or where the students will use privacy facilities with

someone of the opposite sex." *Id.* at 376–77. The *Doe* Court found that "[t]he plaintiffs have not

identified and this court has not located any court that has recognized a constitutional right of

privacy as broadly defined by the plaintiffs." *Id.* at 383. The court noted that the plaintiffs' right:

> is so expansive that it would be a constitutional violation for a
> female to be in the presence of a male inside of a locker room or
> bathroom and vice versa, and it would be a violation of one's
> constitutional right of privacy to view a member of the opposite
> sex in a state of undress even if the viewing party was fully clothed
> at the time. There is no support for such a broad right of privacy
> that has yet to be recognized.

*Id.* at 386. Indeed, the Third Circuit agreed, writing: "[W]e decline to recognize such an

expansive constitutional right to privacy—a right that would be violated by the presence of

students who do not share the same birth sex. Moreover, no Court has ever done so." *Doe*, 2018

WL 3016864, at *9.

    The district court in *Doe* then engaged in an in-depth analysis of *Students & Parents*,

ultimately adopting the reasoning therein. *Doe*, 276 F. Supp. 3d at 385–86. The court concluded

that plaintiffs "have no constitutional right not to share restrooms and locker rooms with

transgender students whose sex assigned at birth is different from theirs." *Id.* at 387. Similar to

*Students & Parents*, the court in *Doe* was persuaded that the case did not involve any compelled and involuntary exposure of genitals nor did it involve a strip search or other egregious privacy infringement. The court concluded that the school's policy was narrowly tailored to serve a compelling government interest in not discriminating against transgender students.

Lastly, Defendants rely on a Southern District of Ohio decision denying a school district's motion for a preliminary injunction against USDOE. *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 854 (S.D. Ohio 2016). The plaintiff school district in that case sought to enjoin USDOE from requiring it to permit a transgender girl to use the girls' restroom. *Id.* The district attempted to justify excluding Jane, a transgender girl student, by asserting the privacy rights of other students. *Id.* at 874. The court found that there was "no evidence that Jane herself, if allowed to use the girls' restroom, would infringe upon the privacy rights of any other students." *Id.*[8] The district argued that the "students' 'zone of privacy' in the restroom starts at the door of the restroom, not merely at the stall door, and that, therefore, students' privacy interests would be imperiled if Jane even enters the girls' bathroom." *Id.* at 875. The court found that there were no complaints of privacy violations and the district's "purported justification for its policy is 'merely speculative' and lacks any 'factual underpinning.'" *Id.* It concluded that the district "cannot show that its refusal to let Jane use the girls' restroom is substantially related to its interest in student privacy." *Id.* at 867.

In contrast with Defendants' authority, Plaintiffs present the Court with unpersuasive precedent that fails to establish their purported privacy right. Plaintiffs argue that their asserted privacy right finds its genesis in the Ninth Circuit's decision in *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). The Ninth Circuit explained: "We cannot conceive of a more basic subject of

---

[8] The Third Circuit in *Doe* affirmed the district court's ruling "that even if a cisgender plaintiff had been viewed by a transgender student, it would not have violated the cisgender student's constitutional right to privacy." 2018 WL 3016864, at *4.

privacy than the naked body. The desire to shield one's unclothed figured from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Id.*; *see also Sepulveda v. Ramirez*, 967 F.2d 1413, 1415 (9th Cir. 1992) (stating that the "right to bodily privacy was established" in *York*). *York* involved a male police officer taking unnecessary nude photographs of a female victim in provocative positions and circulating them to other officers. 324 F.2d at 452. The Ninth Circuit reversed the trial court's decision to dismiss the plaintiff's claim, holding that the complaint sufficiently alleged that the officer's acts "constitute an arbitrary intrusion upon the security of her privacy, as guaranteed to her by the Due Process Clause of the Fourteenth Amendment." *Id.* at 456.

Based in part on *York*, Plaintiffs cite to several Ninth Circuit decisions acknowledging a right to bodily privacy. For example, in *Byrd v. Maricopa County Sheriff's Department*, 629 F.3d 1135 (9th Cir. 2011), the Ninth Circuit considered the constitutionality of a strip search in jail. A female cadet conducted a strip search of a male detainee in the presence of approximately three dozen cadets and detention officers as well as other male detainees. *Id.* at 1137. The cadet searched over the detainee's boxer shorts using her hands to search over his buttocks and genitals. *Id.* The Ninth Circuit held that the cross-gender strip search, in the absence of an emergency, was a violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches. *Id.* at 1146–47.

Similarly, in *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 670 (9th Cir. 1988), the Ninth Circuit considered whether a federal regulation requiring the presence of a female wildlife observer on a commercial fishing vessel violated the male crewmembers' right to privacy. Given the tight quarters of the fishing vessel, the plaintiff crew members alleged that the observer may both see and be seen by crew members while undressing or performing bodily

functions. *Id.* at 672. The Ninth Circuit vacated the district court's grant of a preliminary injunction in the crew members' favor. The court found, in relevant part, that the crew members' "mere allegations of inconvenience" would not support a claim of "irreparable harm to their constitutional rights." *Id.* at 676. The court continued, however, that it would not reach the issue of whether "a female observer would infringe any constitutionally protected privacy interests" because the district court had not considered the plaintiffs' likelihood of success on the merits when it issued the preliminary injunction. *Id.*

In *Supelveda v. Ramirez*, the Ninth Circuit considered whether a male parole officer violated a female parolee's right to bodily privacy by entering the bathroom stall she occupied while she was partially clothed. 967 F.2d 1413, 1416 (9th Cir. 1992). The plaintiff parolee was required to produce a urine sample for a drug test and the male parole officer entered the stall without her consent. *Id.* at 1415. The plaintiff strongly objected, asking the officer to leave. In response, he said that she "did not have anything he had not seen before." *Id.* The parole officer "remained in the stall while Supelveda finished urinating, cleaned herself, and dressed." *Id.* The Ninth Circuit found that, unlike other inmate cases involving obscured cross-sex observations from a distance, Supelveda experienced a "far more degrading" observation. *Id.* The Ninth Circuit rejected the parole officer's claim for qualified immunity, concluding that the plaintiff had asserted a clearly established right to bodily privacy. *Id.*

Each of the Ninth Circuit cases that Plaintiffs cite deal with alleged violations outside of the school context. Further still, these cases involve very different circumstances than the facts of this case. Plaintiffs' Ninth Circuit authority involves a strip search that violated the Fourth Amendment, a female observer sharing ship quarters with male fishermen, a police officer taking unnecessary nude photos of a female crime victim, and a male parole officer entering a female

parolee's bathroom stall while she urinated. Simply put, each involved government-compelled exposure of the plaintiffs' bodies to government actors of the opposite biological sex. At its core, none of these cases support the proposition that high school students have a fundamental right not to share restrooms and locker rooms with transgender students who have a different assigned sex than theirs. Indeed, Plaintiffs' Ninth Circuit authority does not establish that the purported privacy right is implicit in the concept of ordered liberty.

Plaintiffs also rely on two out-of-circuit cases that the Court finds unpersuasive. The only case Plaintiffs cite that discusses a privacy right in the school context is a Sixth Circuit decision involving a parent's challenge to the dress code at his daughter's middle school. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 385 (6th Cir. 2005). The court there framed the plaintiff's asserted privacy right as the right to wear blue jeans, which it rejected. *Id.* at 393–94. Plaintiffs point to the *Blau* court's citation to an old Supreme Court case to support their position. Specifically, in *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891), the Supreme Court stated:

> To compel any one . . . to lay bare the body, or to submit to the touch of a stranger, without lawful authority, is an indignity, an assault, and a trespass; and no order of process, commanding such an exposure or submission, was ever known to the common law in the administration of justice between individuals.

*Id.* at 252. That case involved a defendant's request in a tort action that the plaintiff submit to a surgical examination to determine the extent of her injuries. *Blau*, 401 F.3d at 395. The Sixth Circuit in *Blau* concluded that the plaintiff's reliance on *Pacific Railway* was misplaced and the quote was taken out of context. "Quite plainly, forcing someone to 'lay bare the body' to a surgical procedure is not the same thing as forcing a middle-school student to wear certain types of clothes to school." *Id.* at 395. Here too, the facts of *Blau* and *Pacific Railway* are

distinguishable and do not lend any support for Plaintiffs' purported privacy right relating to the presence of transgender students in school facilities.

The second out-of-circuit case Plaintiffs rely upon is a District of Maine decision involving a pretrial detainee's lawsuit against a jail. *Crosby v. Reynolds*, 763 F. Supp. 666, 667 (D. Me. 1991). The plaintiff alleged that the jail unlawfully housed her with a transgender woman who retained male genitalia. *Id.* Particularly, she alleged that she encountered the transgender detainee while using the shower and restroom. The district court found that it was not "called upon to decide whether a right to privacy would be clearly invaded if males and females generally were housed together." *Id.* at 670 n.5. Instead, it concluded that the contours of the right to privacy were not clear and the defendants were entitled to qualified immunity. *Id.*

Plaintiffs also argue that the language of Title IX and one of its implementing regulations support segregating school facilities based on biological sex. Particularly, 20 U.S.C. § 1686 states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for different sexes." Likewise, a regulation states: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided from students of the other sex." 34 CFR § 106.33. As District points out, however, the first statutory provision above is permissive, not mandatory. *See Doe*, 2018 WL 3016864, at *10. ("This exception is permissive—Title IX does not require that an institution provide separate privacy facilities for the sexes."). This Court agrees that the regulation providing for equivalent facilities does not mandate sex-segregated facilities. Simply put, while Plaintiffs' legal authorities support a school district's decision to provide sex-

segregated facilities, those authorities do not "unequivocally uphold the right to bodily privacy" as Plaintiffs claim. *See* Pls.' Resp. to District Mot to Dismiss 6.

The Court finds that Plaintiffs have failed to sufficiently allege a fundamental right to privacy cognizable under the Fourteenth Amendment. The cases that Plaintiffs rely on are inapposite and involve egregious state-compelled intrusions into one's personal privacy. Put another way, Plaintiffs draw heavily on prisoner and police cases distinguishable from the issue presented in this case. Those cases involved government officials viewing or touching the naked bodies of persons of the opposite sex against their will. Even under some of those circumstances, courts have rejected the asserted privacy right.

The Court is persuaded by Defendants' authority and concludes that high school students do not have a fundamental privacy right to not share school restrooms, lockers, and showers with transgender students whose biological sex is different than theirs. The potential threat that a high school student might see or be seen by someone of the opposite biological sex while either undressing or performing bodily functions in a restroom, shower, or locker room does not give rise to a constitutional violation. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S. Ct. 2386, 2393, 132 L. Ed. 2d 564 (1995) (recognizing that "[p]ublic school locker rooms . . . are not notable for the privacy they afford" and legitimate expectations of privacy in such spaces are lessened); *Doe*, 2018 WL 3016864, at *8; *Whitaker*, 858 F.3d at 1052–53; *Students & Parents R&R*, 2016 WL 6134121, at *24–27; *Evancho*, 237 F. Supp. 3d at 291. To hold otherwise would sweepingly expand the right to privacy beyond what any court has recognized. The Supreme Court has repeatedly emphasized its reluctance to expand substantive due process rights such as the right to privacy. It has stressed that the short list of liberty rights "protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and

upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Gluckberg*, 521 U.S. at 720. The right that Plaintiffs' assert cannot be added to that list.

**B.    *Infringement of the Right***

Even assuming Plaintiffs' asserted privacy right is fundamental, then the Court must determine whether District's challenged conduct infringed the right and if so whether "the infringement is narrowly tailored to serve a compelling government interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

Plaintiffs allege that because Student A has been allowed to access school facilities, "biologically male and female students . . . have experienced, or may experience, embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity because they will have to use locker rooms, showers and restrooms with a student of the opposite sex." Compl. ¶ 43. Students are allegedly afraid of being seen by and sharing space with students of the opposite biological sex while undressing. *Id.* at ¶ 44. Particularly, Plaintiffs allege that students are afraid to attend to their personal needs, avoid using school facilities, have dropped PE classes, change as quickly as possible, or avoid restrooms altogether. *Id.* at ¶47. Further still, Plaintiffs allege that the facilities do not adequately ensure student privacy because the stalls are not fully private as there are large gaps all around the stall doors that would allow other students to inadvertently see through. *Id.* at ¶ 83. Because of those gaps, students are at risk of exposing themselves to the opposite sex when they use the restroom. *Id.* In sum, Plaintiffs allege that this risk of intimate exposure to the opposite sex violates the students' fundamental right to privacy. *Id.* at ¶¶ 198–204.

In cases involving similar or stronger factual allegations, courts found that the student plaintiffs had failed to sufficiently allege that their schools had violated their right to privacy. In *Students & Parents*, the district court considered allegations that student plaintiffs would suffer fear and anxiety given the risk of exposure to the opposite sex in school facilities. Plaintiffs in this case, like the plaintiffs in *Students & Parents*, do not allege that any transgender student and any Student Plaintiff "ever saw an intimate part of the other's body." *Students & Parents R&R*, 2016 WL 6134121, at *28. The court found that "[i]nside the stalls, there is no meaningful risk that any part of a student's unclothed body would be seen by another student. Therefore, these protections almost entirely mitigate any potential risk of unwanted exposure by or to any Student Plaintiff." *Id.* at *29.

In *Doe*, the court considered greater evidence of possible infringement and found no constitutional violation. As described above, a boy plaintiff in *Doe* saw a transgender boy in the locker room wearing only shorts and a bra. *Doe*, 276 F. Supp. 3d at 382. In that case, a female student also entered a bathroom and saw a transgender girl while both were fully clothed. *Id.* Another boy student testified that while he was in his underwear in the locker room, a transgender boy was in close proximity to him. *Id.* The *Doe* court concluded:

> Since this matter does not involve any forced or involuntary exposure of a student's body to or by a transgender person, and the School District has instituted numerous privacy protections and available alternatives for uncomfortable students or to protect against involuntary exposure of a student's partially clothed or unclothed body, the plaintiffs have not shown that the defendants infringed upon their constitutional privacy rights.

*Id.* at 388–89; *see also Whitaker*, 858 F.3d at 1054 (the Seventh Circuit held that the plaintiffs had not demonstrated that presence of a transgender student in school facilities caused an invasion of any other student's privacy).

Even assuming that the presence of a transgender student in school facilities posed a risk of privacy infringement, which this Court finds it does not, the cases discussed above also found that policies permitting transgender access were narrowly tailored to satisfy constitutional scrutiny. For example, in *Doe*, the Third Circuit recognized that cisgender plaintiffs may experience a certain level of stress due to transgender students' presence in school facilities, but that stress was not "comparable to the plight of transgender students who are not allowed to use facilities consistent with their gender identity." 2018 WL 3016864, at *3. The *Doe* court found that the school district "had a compelling state interest in protecting transgender students from discrimination." *Id.* at *6. The plaintiffs in *Doe* and Plaintiffs in this case both argued that a school policy allowing all students to use single-user accommodations or restrooms consistent with their biological sex would be narrowly tailored. The *Doe* court rejected that argument, finding that such a policy would violate the compelling interest identified above and brand transgender students, inviting greater scrutiny from their peers. *Id.* at *8.

In conclusion, based on the facts alleged in this case and the authority discussed above, Plaintiffs' Fourteenth Amendment claim for a violation of the right to privacy must be dismissed.

## III.     Title IX

Plaintiffs claim that District's Plan violates Title IX's prohibition of sex discrimination by creating a sexually harassing hostile environment. District responds that the Plan comports with Title IX. BRO and State extend District's argument and contend that Plaintiffs' request that school facilities to be segregated based on biological sex would itself violate Title IX. Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). An

implementing regulation similarly provides: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

### A.     *Hostile Environment*

Title IX hostile environment claims require that the school district: (1) had actual knowledge of; (2) and was deliberately indifferent to; (3) harassment because of sex that was; (4) "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). Defendants move to dismiss the Title IX claim on the basis that Plaintiffs fail to establish the third and fourth hostile environment elements. First, Plaintiffs have not shown that the Plan targets or treats them any differently from other students who attend Dallas High School. Second, Defendants argue that transgender students' use of school facilities is not severe, pervasive, or objectively offensive.

As to Defendants' first argument, they explain that the Plan applies equally to all students and is not discriminatory on the basis of sex. The district court in *Students & Parents* agreed with that position. There, the court found that the student plaintiffs "are not being targeted or singled out by District 211 on the basis of their sex, nor are they being treated any different than boys who attend school within District 211." *Students & Parents R&R*, 2016 WL 6134121, at *31. The court elaborated that the bathroom policy applied to all restrooms:

> That means cisgender boys use the boys' restrooms with transgender boys just like cisgender girls use the girls' restrooms with transgender girls. District 211 also has made clear that it will allow transgender boys to use the boys' locker rooms and will provide the same privacy protections in the boys' locker rooms as exist in the girls' locker rooms, if requested. Therefore, the alleged

discrimination and hostile environment that Girl Plaintiffs claim to experience is not on the basis of their sex, and any discomfort Girl Plaintiffs allege they feel is not the result of conduct that is directed at them because they are female. All of Plaintiffs' Title IX claims suffer from this threshold problem.

*Id.* (internal citation omitted); *see also Doe*, 276 F. Supp. 3d at 394 (considered the same issue, agreeing with *Students & Parents*, and concluding that the plaintiffs failed to make the threshold showing that they suffered discrimination on the basis of sex).

The *Doe* court also found that the school district's "similar treatment of all students is fatal to the plaintiffs' Title IX claim." 276 F. Supp. 3d at 394. The court explained:

The plaintiffs have failed to cite to any case holding that a plaintiff can maintain a sexual harassing hostile environment claim when the allegedly sexually harassing party treats all individuals similarly and there is, as such, no evidence of gender/sex animus. Simply because the plaintiffs feel a particular way which they equate to their sex does not take away from the fact that the School District's practice is not targeting any group or individual because of their sex. Even if the court were to find that the practice is based on sex, the plaintiffs ignore that Tile IX deals with 'discrimination' based on sex and there can be no discrimination when everyone is treated the same.

*Id.*

The Court is persuaded that District's Plan does not discriminate on the basis of sex within the meaning of Title IX. Plaintiffs argue that the Plan does not treat everyone the same because students are experiencing apprehension about encountering someone of another sex in an intimate space. Plaintiffs do not, however, assert any legal support for the proposition that the Plan discriminates against on the basis of their sex. *See* Pls.' Resp. to District's Motion to Dismiss 10–12. Nor do Plaintiffs attempt to overcome *Students & Parents* or *Doe* previously discussed. In this case, as in *Students & Parents* and *Doe*, District's plan does not target any

Student Plaintiff because of their sex. In other words, Student Plaintiffs have not demonstrated that they are being treated any differently from other students at Dallas High School.

As outlined above, Defendants also argue that Plaintiffs have not alleged harassment that was severe, pervasive, and objectively offensive such that it deprived Student Plaintiffs of educational opportunities. Defendants contend that conduct which rises to this level generally requires instances of physical sexual contact or threatened physical sexual contact. The mere presence of a transgender student is insufficient to establish a hostile environment. Indeed, it is telling that Plaintiffs' complaint does not contain any allegation of harassment or misuse of school facilities.

Courts have recognized that the presence of transgender people in an intimate setting does not, by itself, create a sexually harassing environment that is severe and pervasive. For example, in *Students & Parents*, the court considered the same argument proffered by Plaintiffs in this case and concluded that "[g]eneralized statements of fear and humiliation are not enough to establish severe, pervasive or objectively offensive conduct." 2016 WL 6134121, at *32. The trial court found that "[t]he mere presence of a transgender student in a restroom or locker room does not rise to the level of conduct that has been found to be objectively offensive, and therefore hostile, in other cases." *Id.* The court then explained that cases which found that the conduct was severe and pervasive involved egregious and persistent acts of sexual violence and verbal harassment. *Id.* Additionally, the court in *Students & Parents* found that any risk of a hostile environment was sufficiently mitigated by privacy protections put in place at the school. *Id.* at *33–34. The court concluded that the plaintiffs failed to show that any students were denied equal educational opportunities or access to benefits. *Id.*

Likewise, *Doe* followed *Students & Parents*, finding that the plaintiffs failed to show that the school district's practice was "so severe, pervasive, and objectively offensive that it undermined and detracted from their educational experience." 276 F. Supp. 3d at 396. As with Title VII, the objective prong of this element requires looking at the totality of the circumstances which includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it so undermines and detracts from the victims' educational experience, that he or she is effectively denied equal access to an institution's resource and opportunities." *Id.* at 396–97 (citation and alterations omitted). In that case, the district court found that the few instances in which transgender and cisgender students encountered each other in different stages of undress in school facilities was insufficient to show that "plaintiffs were subjected to pervasive sexual harassment in regard to their actual interaction with transgender students in the privacy facilities[.]" *Id.* at 397.

The court in *Doe* also rejected the plaintiffs' fallback position that the mere presence of transgender students in school facilities was severe and pervasive. The *Doe* court stated that plaintiffs failed to cite "any case stating that the mere possibility of future exposure to the alleged harassment can render a single instance of harassment pervasive." *Id.* It concluded that plaintiffs failed to establish that the mere presence of transgender students was severe and pervasive. Additionally, the plaintiffs there had not established that the school district's conduct was objectively offensive "because a reasonable person would not find the practice of allowing transgender students to use the locker rooms and bathrooms corresponding to their gender identity to be hostile, threatening or humiliating." *Id.* The court explained:

> There is no evidence that these students have committed any lewd acts in the locker room or bathrooms or that they have even interacted with the plaintiffs in any way whatsoever. There is no evidence that the transgender students have harassed the plaintiffs

> or any other student. All the evidence showed was that the transgender students were in the facilities for their intended purposes and they conducted themselves appropriately while in those areas.

*Id.* at 401–02.

Similarly, in the Title VII employment context, the Eighth Circuit determined on summary judgment that the presence of a transgender woman in the women's faculty bathroom did not create a sexually harassing environment. *Cruzan v. Special Sch. Dist, No. 1*, 294 F.3d 981, 984 (8th Cir. 2002). The *Cruzan* court found that the plaintiff "failed to show the school district's policy allowing Davis to use the women's faculty restroom created a working environment that rose to this level." *Id.* The appellate court was further persuaded by the fact that the plaintiff did not assert that the transgender woman "engaged in any inappropriate conduct other than merely being present in the women's faculty restroom." *Id.* Under the totality of the circumstances, the court concluded that a reasonable person would not have found that environment hostile or abusive. *Id.*

In this case, Plaintiffs' response to Defendants' arguments and the line of cases discussed above lacks merit. Without citing any authority, Plaintiffs argue the following:

> Severity may vary with the students affected. Its pervasiveness cannot be doubted when [the Plan] applies to an entire campus and student body, and may later be applied to other schools as well. Objective offensiveness should also not be determined as a matter of law in a society where sex-segregated facilities in public and private venues are the norm.

Pls.' Resp. to District's Motion to Dismiss 12. The Court is unpersuaded. Whether the alleged harassment is severe, pervasive, or objectively offensive requires showing that the victims were effectively denied equal access to educational resources and opportunities. Plaintiffs have not

satisfied that burden by simply alleging that District's plan may be widely applied and sex-segregated facilities are well-established.

In conclusion, Plaintiffs have not made out the necessary elements of their hostile environment Title IX claim. Plaintiffs have failed to cite to any case law supporting the propositions that District's Plan discriminates because of sex, or that it creates a severe, pervasive, and objectively offensive environment.

**B.     *Plaintiffs' Requested Relief***

BRO and State further argue that Plaintiffs' requested relief would violate Title IX. Specifically, Plaintiffs' request for a court order requiring transgender students to use single-user facilities or facilities that match their biological sex is a form of sex discrimination under the statute. The Ninth Circuit has recognized that discrimination against a transgender person because of their gender identity is discrimination because of sex. *See Kastl v. Maricopa Cty. Cmty. Coll. Dist.*, 325 F. App'x 492, 493 (9th Cir. 2009).[9] In *Kastl*, a transgender woman brought Title VII and Title IX claims against the community college where she worked as an instructor. *Id.* Kastl challenged the defendant's decision to ban her from using the women's restroom in response to a complaint that a man was using it. *Id.* Additionally, Kastl's contract was not renewed. *Id.* The Ninth Circuit stated that "gender stereotyping is direct evidence of discrimination prohibited by Title VII." *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). The court elaborated that "it is unlawful to discriminate against a transgender (or any other) person because he or she does not behave in accordance with an employer's expectation for men or women." *Id.* The Ninth Circuit, nevertheless, upheld the district court's decision to grant summary judgment on her gender discrimination claim because she was unable

---

[9] Notably, Justice Gorsuch sat by designation on this case alongside Judges Fletcher and McKeown.

to prove that the defendant's actions were motivated by her gender. *Id.* at 494. Kastl's Title IX claim fell with her Title VII claim on the same ground. *Id.*

In a recent decision coming out of the Southern District of California, a court relied on *Kastl* to emphasize that "sex" under Title VII and Title IX encompasses both biological difference and gender. *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–99 (S.D. Cal. 2017). The court in *Prescott* recognized that "[o]ther Circuits have similarly interpreted the sex discrimination provisions under Title IX and Title VII to protect transgender individuals from discrimination." *Id.* at 1098–99 (collecting cases). While these two cases may demonstrate that the Ninth Circuit interprets the term sex" as used in Title IX to include gender identity, neither case expressly supports the proposition that a policy requiring transgender students to use facilities that match their biological sex is sex discrimination. Indeed, in the February 2017 Dear Colleague Letter, Federal Defendants maintain that discrimination against transgender students is prohibited by Title IX, while at the same time they deferred to the discretion of school administrators on the issue of segregated facilities. The question remains, then, whether preventing transgender students from using facilities consistent with their gender identity constitutes discrimination because of sex.

Other circuits have provided more direct guidance on this issue. The Seventh Circuit in *Whitaker* unequivocally found that the relief which Plaintiffs in this case seek would violate Title IX. 858 F.3d at 1047–50. The court explained that "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Id.* at 1048. Like the court in *Prescott*, the *Whitaker* court also noted that several circuits and district courts have recognized that discrimination against someone because they are transgender is sex-stereotyping and discrimination for gender nonconformity. *Id.* at 1048–49 (collecting cases).

> A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX. The School District's policy also subjects Ash, as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX.

*Id.* at 1049–50. The Seventh Circuit further held that providing Ash with gender-neutral alternatives was insufficient because it increased the stigmatization he faced. *Id.* at 1050.

Likewise, the Third Circuit in *Doe* relied on *Whitaker* to write that "barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation." *Doe*, 2018 WL 3016864, at *10. The Third Circuit, however, did not provide a definitive ruling on that issue, instead relying on *Whitaker* to hold that the plaintiffs were not likely to succeed on the merits of their Title IX claim. *Id.* at *13. The Third Circuit held that "a court may not issue an injunction that would subject the transgender students to different conditions than their cisgender peers are subjected to." *Id.* at *14; *see also Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011) (recognizing that discrimination against a transgender person because of their gender identity is discrimination because of sex); *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004) (holding that gender stereotyping is a form of sex discrimination under Title VII).

Other district courts have reached similar conclusions. On remand from the Fourth Circuit, the district court in *Grimm* concluded that "discrimination on the basis of transgender status constitutes gender stereotyping because by definition, transgender persons do not conform to gender stereotypes." *Grimm v. Gloucester Cty. Sch. Bd.*, Civ. No. 4:15cv54, 18 (E.D. Va. May 22, 2018) (internal quotation marks and citation omitted) (quoting *M.A.B. v. Bd. Of Educ. Of Talbot Cty.*, 286 F. Supp. 3d 704, 714 (D. Md. Mar. 12, 2018)). When analyzing whether the Title IX claim based on gender stereotyping was sufficiently pled, the *Grimm* court relied on

*Whitaker* to conclude that a policy requiring transgender students to use bathrooms that do not conform with their gender identity is a violation of Title IX. *Id.* at 22 (citing *Whitaker*, 858 F.3d at 1049–50). The availability of gender-neutral alternatives is "insufficient to relieve the school board of liability, 'as it is the policy itself which violates [Title IX.]'" *Id.* (quoting *Whitaker*, 858 F.3d at 1040); *see also M.A.B.*, 286 F. Supp. 3d at 716 (finding that a policy denying a transgender boy from accessing the boys' locker rooms because of his gender identity was sex discrimination under Title IX).

The Court finds that the reasoning in *Whitaker* and cases following it is persuasive. A court order directing District to require students to use only facilities that match their biological sex or to use gender-neutral alternative facilities would violate Title IX. Forcing transgender students to use facilities inconsistent with their gender identity would undoubtedly harm those students and prevent them from equally accessing educational opportunities and resources. Such an injunction or District policy would punish transgender students for their gender nonconformity and constitute a form of sex-stereotyping. *Whitaker*, 858 F.3d at 1048–50. Accordingly, the Court finds that Plaintiffs' requested relief itself would violate Title IX.

## IV.     Oregon State Law Claims

Plaintiffs allege that District's Plan violates the Oregon law prohibiting discrimination in education and public accommodation. *See* O.R.S. 659.850, 659A.403. District and BRO move to dismiss these claims. BRO further argues that the relief Plaintiffs seek violates Oregon anti-discrimination laws.

//

//

**A.    O.R.S. 659.850: Discrimination in Education**

To make out a discrimination in education claim under Oregon law, Plaintiffs must show that District's action either: (1) "unreasonably differentiates treatment"; or (2) "is fair in form but discriminatory in operation . . . based on sex." O.R.S. 659.850(1). The Oregon Court of Appeals has interpreted "unreasonably differentiates treatment" to mean "disparate treatment discrimination—i.e., a policy or practice that affirmatively treats some persons less favorably than other persons based on certain protected criteria, such as . . . sex[.]" *Nakashima v. Or. Bd. of Educ.*, 344 Or. 497, 509, 185 P.3d 429, 437 (2008). In *Nakashima*, the appellate court recognized that the second requirement above was taken directly from the Supreme Court's decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), which embraced the disparate impact theory of discrimination. *Id.* at 509–10, 185 P.3d at 437.

In this case, there are no allegations that the Plan differentiates or is discriminatory in operation. As discussed above, the Plan does not single out or treat any Student Plaintiff differently from any other student on the basis of sex. *See supra* Part III. Further, Plaintiffs have not demonstrated that their privacy right encompasses the right to use school facilities to the exclusion of transgender students. *See supra* Part II. Simply put, Plaintiffs have not carried their burden of sufficiently alleging either disparate treatment or discriminatory impact. Therefore, the Court dismisses this claim.

**B.    O.R.S. 659A.403: Public Accommodation**

Under Oregon law all persons "are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of . . . sex" or "sexual orientation." O.R.S. 659A.403(1). The scope of this statute was expanded to include "sexual orientation" which

means "an individual's actual or perceived heterosexuality, homosexuality, bisexuality or *gender identity*, regardless of whether the individuals *gender identity*, appearance, expression or behavior differs from that traditionally associated with the individual's sex at birth." O.R.S. 174.100(7) (emphasis added).

There are no allegations in the Complaint that implementation of District's Plan denied students equal or full access to public accommodations based on sex. The opposite is true. The Plan ensures that all students have access to school facilities. *See e.g., Doe*, 2018 WL 3016864, at *7 (concluding that a similar policy "benefits all students by promoting acceptance"). Plaintiffs argue that the presence of transgender students in school facilities denies equal access to Student Plaintiffs who are ashamed or embarrassed to share such spaces with transgender students. Those feelings, however, do not equate to unlawful discrimination in public accommodation because the Plan itself does not deny students access to school facilities.

Contrary to Plaintiffs' position, the Oregon Court of Appeals has held that denying access to public accommodations because someone is transgender violates Oregon public accommodations law. *See Blachana, LLC v. Or. Bureau of Labor & Indus*., 273 Or. App. 806, 808, 359 P.3d 574, 575 (2015), *opinion adhered to as modified on reconsideration*, 275 Or. App. 46, 362 P.3d 1210 (2015). In *Blachana*, the court held that a club owner violated Oregon's public accommodations law by banning a group of people, including transgender people, from accessing the club on Friday nights because it was allegedly bad for business. *Id.* The court found that the club owner had discriminated because of the group members' sexual orientation and gender identity. *Id.* at 808–810 n.3, 359 P.3d at 575 (citing ORS 659A.403 and OAR 839-005-0003(16)).

Plaintiffs' argument in response is a non sequitur. *See* Pls.' Resp to District's Mot. to Dismiss 15–16; Pls.' Resp. to BRO's Mot. to Dismiss 9–10. Plaintiffs generally argue that what "would truly be equal treatment would be to allow any student to use single-use facilities on an equal basis[.]" Pls. Resp. to District's Mot. to Dismiss 15. Plaintiffs argue that "other students should have the same opportunity" as Student A and that their requests for accommodations not to share space with transgender students should be granted. Pls.' Resp. to BRO's Mot. to Dismiss 10. Plaintiffs provide no legal support for their public accommodations claim nor do they rebut the authority cited above. The Court's analysis of Plaintiff's arguments made in defense of their Title IX claim applies with equal force here. *See supra* Part III. Accordingly, this claim has not been plausibly alleged and is dismissed.

## C.    *Plaintiffs' Requested Relief*

More broadly, BRO and State raise the issue of whether a policy requiring transgender students to use facilities consistent with their biological sex would violate Oregon law. *See* BRO Mot. to Dismiss 18–19; Amicus Br. 9–10.

Beyond the *Blachana* case discussed above, State—which includes ORDOE responsible for administering and enforcing Oregon's public education law— takes the litigation position that treating transgender students differently by preventing them from using their desired facilities would violate Oregon's public accommodation law. ORDOE promulgated guidance for school districts entitled: "Creating a Safe and Supportive School Environment for Transgender Students." Compl. Ex. M-1, at 1. That guidance provides:

> It is recommended that school districts accept a student's assertion of his/her/their own gender identity. A student who says she is a girl and wishes to be regarded that way throughout the school day should be respected and treated like any other girl. So too with a student who says he is a boy and wishes to be affirmed that way

> throughout the school day. Such a student should be respected and
> treated like any other boy.

*Id.* at 4. ORDOE's guidance further recommends that "alternative accommodations, such as single 'unisex' bathroom or private changing space, should be made available to students who request them, but should not be forced upon students, or presented as the only option." *Id.* at 10. Additionally, the guidance recommended that transgender students be allowed to use facilities consistent with the student's gender identity. *Id.* at 11.

State contends that Oregon anti-discrimination law requires that transgender students be allowed to use facilities they desire. Oregon's statutory scheme, case law, and administrative guidance discussed above support State's position. Oregon law prohibits discrimination in public education based on an individual's gender identity. Plaintiffs seek a Court order directing District to treat transgender students differently based on their gender identity in violation of Oregon law. O.R.S. 659A.403(1); O.R.S. 174.100(7). A policy that segregates school facilities based on biological sex and prevents transgender students from accessing facilities that align with their gender identity violates Oregon law.

## V.     The Right to Direct the Education and Upbringing of One's Children

Next, Defendants move to dismiss Plaintiffs' claim that District's Plan violates Parent Plaintiffs' fundamental right to direct the education and upbringing of their children. Plaintiffs allege that District violated their parental rights by exposing their children to members of the opposite biological sex in school facilities.

Federal courts recognize the so-called *Meyer-Pierce* right of parents under the Due Process Clause of the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). "The Supreme Court has held that the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental

liberty interest protected by the Due Process Clause." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005) (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)).

In this case, Plaintiffs allege that their parental right includes "the duty to instill moral standards and values in their children, and to direct their education and upbringing" which "encompasses the right to determine whether and when their minor children endure the risk of being exposed to members of the opposite sex in intimate, vulnerable settings like restrooms, locker rooms and showers." Compl. ¶ 210. Plaintiffs allege that they:

> have a fundamental right to determine whether and when their children will have to risk being exposed to opposite sex nudity at school, as well as a fundamental right to determine whether their children, while at school, will have to risk exposing their own undressed or partially unclothed bodies to members of the opposite sex.

*Id.* at ¶ 211. In *Fields*, the Ninth Circuit recognized that "the right of parents to make decisions concerning the care, custody, and control of their children is not without limitations." 427 F.3d at 1204. Parents' liberty interest does not reside "exclusively" in the parents "nor is it 'beyond regulation [by the state] in the public interest.'" *Id.* (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). The Ninth Circuit elaborated that the *Meyer-Pierce* right does not allow parents to restrict the flow of information in public schools. *Id.* at 1206. "Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent. Such an obligation could not only contravene the educational mission of the public schools, but also would be impossible to satisfy." *Id.*

More importantly, the *Fields* court explained that parents are vested with the right to choose where their children obtain an education. However, "once parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished." *Id.* Parents are not vested with the power to

determine how a school "will provide information to its students or what information it will

provide, in its classrooms *or otherwise*." *Id.* (emphasis added). The Ninth Circuit then adopted

the Sixth Circuit's position on this right:

> Perhaps the Sixth Circuit said it best when it explained, "While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally 'committed to the control of state and local authorities.'"

*Id.* (quoting *Blau*, 401 F.3d at 395–96).

In this case, Parent Plaintiffs seek to expand their right and exercise control over

District's decisionmaking authority embodied in the Plan. It is within Parent Plaintiffs' right to

remove their children from Dallas High School if they disapprove of transgender student access

to facilities. Once the parents have chosen to send their children to school, however, their liberty

interest in their children's education is severely diminished. Plaintiffs cite no case standing for

the proposition that parents retain the right to prevent transgender students from sharing school

facilities with their children. As the Ninth Circuit explained in *Fields*, Parent Plaintiffs'

Fourteenth Amendment liberty interest in the education and upbringing of their children "does

not extend beyond the threshold of the school door." *Id.* at 1207. Accordingly, the Court

dismisses this claim.

## VI.     Plaintiffs' Religious Claims

Lastly, Plaintiffs allege that District's Plan violates their First Amendment right to freely

exercise their religion. Additionally, Plaintiffs claim that Federal Defendants' administrative

actions violate the Religious Freedom Restoration Act ("RFRA"). District and BRO move to

dismiss the free exercise claim. By contrast, Federal Defendants generally move that Plaintiffs'

claims be dismissed for lack standing.

**A.      *First Amendment — Free Exercise***

The First Amendment provides that "Congress shall make no law respecting an

establishment of religion, or *prohibiting the free exercise thereof. . . .*" U.S. Const., Amdt. 1

(emphasis added). The Supreme Court explained:

> The First Amendment obviously excludes all governmental
> regulation of religious *beliefs* as such. The government may not
> compel affirmation of religious belief, punish the expression of
> religious doctrines it believes to be false, impose special
> disabilities on the basis of religious views or religious status, or
> lend its power to one or the other side in controversies over
> religious authority or dogma.

*Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990) (internal quotation marks and citations omitted).

On the other hand, "neutral, generally applicable laws that incidentally burden the exercise of

religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt v. Hobbs*,

135 S. Ct. 853, 860 (2015) (citing *Smith*, 494 U.S. at 878–82). Generally applicable neutral laws

"need not be justified by a compelling governmental interest even if the law has the incidental

effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v.*

*City of Hialeah*, 508 U.S. 520, 531 (1993). Such laws are permissible if they are rationally

related to a legitimate government interest. *Id.* at 531. "A law failing to satisfy these

requirements must be justified by a compelling governmental interest and must be narrowly

tailored to advance that interest." *Id.* at 531–32.

Plaintiffs' religious allegations are succinct. They contend that the Plan is not generally

applicable and that it burdens the free exercise rights of some Plaintiffs. Compl. ¶¶ 258–264. The

complaint alleges that "[s]ome students and parent members of Parents for Privacy, including

Jon & Kris Golly and their children, are devout Christians whose faith requires that they preserve their modesty and not use the restroom, shower, or undress, in the presence of the opposite sex." *Id.* at ¶ 120. Likewise, the Complaint alleges that "[s]ome parent Plaintiffs, including Jon and Kris Golly, object to the Student Safety Plan for religious reasons because of their sincerely-held religious beliefs about modesty and other religious doctrines." *Id.* at ¶ 216.

Plaintiffs claim that the Plan is not generally applicable because it pertains specifically to Student A. Plaintiffs misunderstand the law. Neutrality and general applicability are considered with respect to religion. *Lukumi*, 508 U.S. at 532–33. A law is neutral and generally applicable if it does not "infringe upon or restrict practices because of their religious motivation," and if it does not "in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Id.* at at 533. Moreover, the Plan states in its opening paragraph that it is "aimed to support all students in this transition." Compl. Ex. A.

In this case, the law is neutral and generally applicable with respect to religion. There are no allegations that District forced any Plaintiff to embrace a religious belief, nor does the Plan punish anyone for expressing their religious beliefs. In any event, Plaintiffs do not have standing to bring this claim. The Gollys do not have a child at Dallas High School and are therefore unaffected by the Plan. Plaintiffs' generalized allegation that the unspecified religious beliefs of unidentified plaintiffs would be burdened lacks specificity, cannot sustain Plaintiffs' First Amendment claim.[10]

//

//

---

[10] Plaintiffs argue that strict scrutiny should apply because they have asserted a hybrid-rights claim combining free exercise with their other asserted rights, i.e. privacy and parental rights. *See Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999). However, given that the Court dismisses Plaintiffs' parental rights claim, Plaintiffs' assertion of a hybrid claim also fails.

**B.      RFRA**

The Supreme Court recognizes that Congress enacted RFRA "in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S. Ct. at 860 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014)).

> RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

*Id.* at 860 (quoting 42 U.S.C. §§ 2000bb-1(a), (b)).

Plaintiffs allege:

> Many student Plaintiffs have religious convictions that they practice modesty. These students have the sincere religious belief that they must not undress, or use the restroom, in the presence of the opposite biological sex, and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom.

Compl. ¶ 249. Plaintiffs also reassert Kris and Jon Golly's religious beliefs in support of the RFRA claim. *Id.* at ¶ 250.

This claim is alleged solely against Federal Defendants; however, it lacks any allegation relating to their actions. The only causal connection Plaintiffs posit is that Federal Defendants' administrative actions caused District to enact the Plan. As discussed above when analyzing Plaintiffs' APA claim, Plaintiffs have failed to allege the requisite causation to establish Article III standing. *See supra* Part I. Plaintiffs' lack of standing extends to all of its claims against Federal Defendants, as the sole and tenuous thread of causation fails to tie Federal Defendant's Rule to District's Plan. Once more, assuming Federal Defendants contributed to the promulgation of the Plan, granting Plaintiffs the relief they seek under RFRA would not cause

District to withdraw its Plan—which is the sole source of injury alleged in their RFRA claim. Accordingly, Plaintiffs' RFRA claim is dismissed.

## CONCLUSION

District, Federal Defendants, and BRO's motions to dismiss [30] [31] [49] are GRANTED. The Court finds that Plaintiffs cannot plausibly re-allege their claims and that any amendment would be futile. For the reasons discussed above, the Court dismisses with prejudice all of Plaintiffs' claims. Accordingly, Plaintiffs' motion for a preliminary injunction is DENIED as moot.

Dated this ____ day of _July_____, 2018.


_____
MARCO A. HERNÁNDEZ
United States District Judge